UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------
THOMAS MALIK,

                Plaintiff,

– against –

THE CITY OF NEW YORK, LOUIS
SCARCELLA, STEPHEN CHMIL,
and JOHN AND JANE DOES 1-25,

                Defendants.
-----------------------------------------------

Case No. 23-CV-_____

**<u>COMPLAINT</u>**

JURY TRIAL DEMANDED


RONALD L. KUBY
RHIDAYA TRIVEDI
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, NY 10011
212-529-0223
ronaldlkuby@gmail.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

NATURE OF THE ACTION ...................................................................................... 3

JURISDICTION AND VENUE ................................................................................. 4

CONDITIONS PRECEDENT ................................................................................... 4

PARTIES ..................................................................................................................... 5

Jury Demand .............................................................................................................. 7

STATEMENT OF FACTS ......................................................................................... 7

   **A.**  **The Crime and the Investigation: Initial Suspects**................................ 7

   **B.**  **Irons is Coerced into Giving a False Confession in which he Implicates Malik, Ellerbe, Chris, Eric, Andre, and Ringy (Ringo).** ....................................... 15

   **C.**  **Vincent Ellerbe is Coerced into Giving a False Confession Implicating Malik, Irons, Andre, Chris, and Eric.** .............................................................. 17

   **D.**  **Malik is Coerced into Giving a False Confession.** ................................ 19

   **E.**  **Lineups: Robinson Makes New Identifications**...................................... 22

   **F.**  **Serial Perjurer Marlon Avila, a/k/a Rayquan Shabazz, Enters the Frame.** .. 22

   **G.**  **Trial, Conviction and Sentence**............................................................ 24

   **H.**  **The Re-Investigation**............................................................................ 24

   **I.**  **Exoneration** ........................................................................................... 28

INVESTIGATIVE REPORTS ON INSTITUTIONAL DEFICIENCES WITHIN THE NEW YORK CITY POLICE DEPARTMENT AND THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE........................................................................... 28

   **A.**  **Demonstrated History of Police Misconduct by Defendants Louis Scarcella and Stephen Chmil.** ................................................................................ 33

   **B.**  **Other Case Studies in Improper Police Conduct** ................................. 39

   **C.**  **Former District Attorney Charles Hynes's Deliberate Indifference to the Prosecutorial and Investigative Misconduct Occurring in His Office**.................. 44

   **D.**  **The Ample Notice to Former District Attorney Charles Hynes of the Prosecutorial and Investigative Misconduct Occurring in His Office**.................. 48

   **E.**  **Examples of the Kings County District Attorney's Office's Unlawful Policies, Practices, and Customs** ........................................................................ 50

Damages..................................................................................................................... 53

Causes of Action ...................................................................................................... 55

First Cause of Action .................................................................................. 55

Second Cause of Action ............................................................................. 58

Third Cause of Action ................................................................................ 60

Fourth Cause of Action .............................................................................. 64

Fifth Cause of Action ................................................................................. 66

Sixth Cause of Action ................................................................................ 66

Request for Relief ...................................................................................... 67

## **INTRODUCTION**

1.      On November 26, 1995, Harry Kaufman, a subway toll collector in Brooklyn, refused to surrender money to two robbers, one of whom brandished a rifle. The other poured gasoline into the token slot and ignited it, blowing up the toll booth, the money, and Kaufman. The duo fled and they were never captured.

2.      Kaufman lingered in the hospital with excruciatingly painful burns, while the press kept a daily vigil until he succumbed on December 10, 1995.

3.      New York Mayor Rudy Giuliani immediately dubbed the case the "Money Train" murder, claiming that it was inspired by a recently released film called "Money Train" that featured a similar scene. The "Money Train" appellation caught on quickly with both the press and public officials. It became one of the most highly publicized murders in New York City during the Giuliani era.

4.       Thomas Malik (Malik) was arrested on December 15, 1985, and charged with second-degree murder and attempted robbery. He was not involved with the crime. Like most of New York, he learned of it from the media.

5.      Malik was tried jointly with Vincent Ellerbe, (Ellerbe) a close friend. A third defendant, James Irons (Irons), whom Malik barely knew and with whom he had no association, was tried separately. All three men were convicted after highly publicized trials and sentenced to identical maximum terms of 25 years to life by the trial judge, the late Francis Xavier Eggito, who took great pride his nickname, "Maximum Frank."

6.      After a *nine-year* reinvestigation by KCDA's Conviction Review Unit, (CRU) spanning three different administrations, Malik, along with his co-defendants Irons and Ellerbe, were exonerated on July 15, 2022.

7.      The Kings County District Attorney's Office determined that Malik and the others were wrongfully convicted, that there was no credible evidence of guilt, and that the conviction must be overturned, and the indictment dismissed. The KCDA and Malik filed a joint motion to vacate the conviction and dismiss the case.

8.      Said Motion was granted on July 15, 2022, pursuant to C.P.L. Sec. 440.10(1)(g). Malik walked out of the courthouse and into the arms of his family for the first time since his arrest.

9.      Malik entered prison at the age of eighteen and emerged at forty-five. He is "psychologically crippled," according to a forensic psychologist. Over one year later, he continues to suffer from PTSD, overwhelming agoraphobia, and overpowering anxiety. His prognosis is grim.

10.      Prior to overturning the conviction, the CRU issued their longest report ever — 66 pages in length, with 168 footnotes — discussing in meticulous detail the misconduct of disgraced Detective Louis Scarcella and Stephen Chmil, and others, that resulted in a) fabricated evidence, b) coerced confessions, c) witness manipulation, d) suppression of exculpatory evidence (including the fact that another man had credibly confessed to the crime), and e) suppression of the fact that the prosecution's star witness — a serial jailhouse informer — had previously admitted in a King's County trial that he "lied for a living." Dr. Saul Kassin, a preeminent expert on false confessions who was retained by the CRU,

reviewed Malik's case, and found it to be deeply troubling and "comparable to some of the worst wrongful convictions I have seen."

11.     In addition to the multitude of case-specific factors that lead to Malik's wrongful conviction cited by the CRU, Malik's wrongful conviction was brought about by policies and practices by Defendant the City of New York (the "City") to prevent its agents' unlawful conduct, including by failing to train, supervise, and discipline its employees; and the City's unlawful policies, customs, and practices that caused violations of the constitutional rights of criminal suspects and defendants, including Malik. Malik seeks redress for the official misconduct that caused him to spend nearly 27 years in prison, and the mental and physical injuries he sustained while incarcerated, as a result of his false and unlawfully procured conviction.

## NATURE OF THE ACTION

12.     This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Malik's rights secured by 42 U.S.C. §§ 1983 and 1988 and by the U.S. Constitution, including its Fourth, Fifth, Sixth, and Fourteenth Amendments, as well as by New York State law, because of Defendants' manufacturing of evidence to arrest and prosecute Malik for crimes he did not commit and suppression of information that was material to the determination of Malik's guilt.

13.     The lawsuit also seeks to hold the City liable for Individual Defendants' misconduct under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City, through the NYPD and KCDA, maintained unlawful policies, practices, and customs during Malik's investigation, arrest, and trial. In executing these unlawful policies, practices, and customs,

3

the City violated the constitutional rights of criminal suspects and defendants, including Malik's rights. The unlawful policies, practices, and customs enabled Individual Defendants, as well as other members, servants, employees, and agents of the City, to violate Malik's constitutional rights. The policy-making officials acting on behalf of the City were deliberately indifferent to these unlawful policies, practices, and customs. The City is likewise liable under the doctrine of *respondeat superior* for the tortious conduct of its agents and violations of the New York State Constitution. As a result, the City is liable for Malik's injuries.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C.§§ 1983 and 1988 in that Malik alleges that he was, under color of law, deprived of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States. This Court has original subject matter jurisdiction over Malik's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Malik's constitutional and civil rights, and supplemental jurisdiction over Malik's state law claims under 28 U.S.C. § 1367.

15.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because Malik's claims arose in this District.

## CONDITIONS PRECEDENT

16.     Malik has complied with all conditions precedent to the commencement of this action, having timely served a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law within the time this

cause of action accrued; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing under Section 50-h of the New York General Municipal Law; having received at the request of the Comptroller two thirty-day enlargements of the Statute of Limitations and having brought this action in a timely manner.

## **PARTIES**

17.    Plaintiff Thomas Malik is a citizen of the United States and was, prior to his incarceration, a resident of Kings County in the City and State of New York.

18.    Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and State of New York, and having the powers and duties imposed by law thereon.

19.    The NYPD and KCDA are and were at all relevant times agencies of Defendant the City of New York. At all times relevant to this action, Defendant the City of New York, by its agents, servants, and employees, was responsible for the operation, maintenance, and control of the NYPD and KCDA, and for the selection, training, supervision, and discipline of police officers and prosecutors.

20.    At all relevant times, the Kings County District Attorney (the "District Attorney" or "DA"), including Charles Hynes, was and is an elected officer of Kings County responsible for the KCDA, an agency funded by Defendant the City of New York.

21.    At all relevant times, the KCDA and its authorized delegates had final authority and constituted policymakers for the City of New York, and for whom the City of New York

is liable, with respect to the hiring, management, training, supervision, and discipline of personnel employed by or assigned to the KCDA.

22.     The District Attorney was and is designated a "local officer," rather than a "state officer," under Section 2 of the New York Public Officers Law.

23.     The State of New York has provided by statute that Defendant the City of New York's constituent counties—including Kings County—and hence Defendant the City of New York itself, is liable for torts committed by County officers and employees, such as the District Attorney and Kings County Assistant District Attorneys, and other employees of the KCDA. *See* N.Y. County Law § 53,941.

24.     Defendant the City of New York was at all times relevant the public employer of Defendants John and Jane Does 1-25, and legally responsible for torts they commit within the scope of their employment or under color of law. Defendant the City of New York is also obligated under law and by contract to indemnify and defend Individual Defendants named herein.

25.     Defendant Louis Scarcella is a retired officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of Second Grade Detective from March 25, 1988, until December 23, 1993, and the rank of First Grade thereafter, until his retirement on March 25, 1999. At all relevant times, Defendant Scarcella acted toward Malik under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City

of New York. This lawsuit seeks to hold Defendant Scarcella liable in his individual capacity.

26.     Defendant Stephen Chmil is a retired officer of the NYPD who served as Defendant Scarcella's longtime partner, including during the investigation and prosecution of Malik. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of Detective. At all relevant times, Defendant Chmil acted toward Malik under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Chmil liable in his individual capacity.

27.     Defendants John and Jane Does 1-25 are employees of the NYPD or KCDA who acted toward Malik under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York; and who participated in the misconduct alleged herein; but whose actual names Malik has been unable to ascertain notwithstanding reasonable efforts to do so. This lawsuit seeks to hold them responsible in their individual capacities.

## JURY DEMAND

Malik hereby demands trial by jury of all issues raised in this complaint.

## STATEMENT OF FACTS

### A. The Crime and the Investigation: Initial Suspects

28.     On November 26, 1995, at approximately 1:40 a.m., two men approached the token booth inside the subway station at Kingston Avenue and Fulton Street in Bedford-Stuyvesant, Brooklyn.

29.     The men attempted to rob Harry Kaufman, the clerk who was in the booth. When Kaufman refused to hand over money, one of the men poured gasoline from a plastic bottle into the coin slot. He or his accomplice then lit a book of matches, igniting the gasoline and causing the booth to explode and burn.

30.     Kaufman was blown out of the booth. He ran upstairs to the street, emerging from the station engulfed in flames. Passersby helped to extinguish the fire on his clothing.

31.     Nineteen calls were made to 911, starting at 1:40:33 a.m., regarding the incident. The callers reported variously that there was an explosion in or near the subway station and that a man was on fire.

32.     One of those callers was Darlene Williams (Williams), who reported that a man on fire just emerged from the subway station. She recounted that she saw emerge from the station "two white boys than ran," "two light skins . . . he could look like [a] white boy" run out of the station and into a dark-colored, four door car parked on Herkimer Street. She also saw a third youth, darker skinned, also emerge and run down Fulton Street. She provided general descriptions of the trio, none of which matched Malik.

33.     Among those 911 calls was one from Irons, who lived near the crime scene and was at home at 1486 Fulton Street with his mother, Miriam Graham, at the time of the murder. Upon hearing the explosion, Mrs. Graham directed Irons to call 911. He called 911 at 1:41:54 a.m., reporting that "somebody on fire" on Fulton and Kingston. Shortly thereafter,

he passed the phone to his mother, telling the operator, "Hold on, my mother wants…." During the call, Irons' breathing was normal and unlabored.

34.     Mrs. Graham took the phone from Irons at 1:43:32 a.m. and provided further information to the operator. She provided her name and phone number and was told that assistance was on its way. The call ended at 1:44:22 a.m. Members of the NYPD and the New York City Fire Department arrived at the crime scene shortly after the 911 calls and transported Kaufman to a hospital. The case was highly publicized, in part because the media and various officials promptly linked the case to a movie called *Money Train*, which had been released four days earlier and allegedly featured a similar subway murder scene.

35.     Then-New York City Mayor Rudy Giuliani immediately dubbed the case the "Money Train" murder, claiming that it was inspired by the film, although he had no evidence on which to base this claim.

36.     The case gained national notoriety when then-Senate Majority Leader and Republican presidential hopeful Bob Dole took to the Senate floor to call for a boycott of the movie.

37.     Major media outlets, including *The New York Times*, the *Los Angeles Times*, and *The Washington Post*, also drew parallels between the crime and the film, describing the crime as a "botched robbery that replayed scenes from the movie 'Money Train'"; reporting that the movie "contains two scenes that are virtual replays of the crime"; and writing that "life imitated art imitating life." Indeed, comparisons between the crime and the movie persisted through the years. Both were featured, for example, in a 2018 episode of the television series *CopyCat Killers*, which tells stories of real crimes purportedly copied from

9

Hollywood movies. This 2018 episode, titled "Money Train," claims the film "inspire[d] an identical copycat crime just four days after the movie premieres," and names Malik as one of the killers.

38.     Defendants Scarcella and Chmil were the lead homicide detectives assigned to the case. Scarcella testified that the burn unit where Kaufman was taken was the same unit where Scarcella's wife was once treated. The evidence recovered from the scene included a rifle, a plastic bottle containing gasoline residue, a book of matches that appeared to have been lit simultaneously, and a burnt glove. The police had several tips early in its investigation, as well as a number of initial suspects.

39.     Those suspects included three men known as "Sport," "Crime," and "Biz."  On November 26, 1995, at approximately 6:30 p.m., a female confidential informant reported to police a conversation she had at about 2:00 a.m. that morning, that Crime and other men blew up the token booth, and that Crime wanted to hide at "Ringy's" drug spot.

40.     On November 27, 1995, the NYPD interviewed Miguel Ortiz, who said he saw Sport, Crime, and Biz with a gun at a party shortly before the murder and that the three men left the party with the gun shortly after 1:00 a.m. Ortiz described the gun in detail and identified a photograph of the gun recovered from the crime scene as the same gun he saw at the party.

41.     Sport and Crime matched the victim's descriptions of the two men who approached and lit his booth on fire.

42.     The NYPD issued "wanted" cards for Sport, Crime, and Biz, all of whom had open arrest warrants at the time of the murder.

43.     Defendants Scarcella and Chmil interviewed Biz, who stated that he and Sport were at the party attended by Ortiz but that he left the party at 5:00 a.m.

44.     There is no evidence of Sport or Crime ever being interviewed by the police in connection with this crime. Their wanted cards in this case were canceled on December 22, 1995, and January 11, 1996, respectively.

45.     How it came to pass that this trio was cleared remained a subject for confusion in the KCDA. In March 1996, one of the trial prosecutors wrote in their notes, "How did we ultimately eliminate crime, sport et. [a]l"? That excellent question was never answered, nor its implications pursued. During the reinvestigation of this case, described in greater detail below, the CRU did not find an answer.

46.     Another initial suspect was "Ringy," whose name first came up on the day of the crime, as noted above, and whom police knew had an open arrest warrant.

47.     On November 27, 1995. A woman called police to tell them that her co-worker, one Jacqueline Robinson, had witnessed the crime. Three detectives interviewed her at her workplace. Although notes were taken of this interview, they were "lost" by the time of trial.

48.     Ms. Robinson reported that she and her friend were talking in her car while parked near the corner of Herkimer Street between Kingston and Atlantic Avenue. She saw two "young boys," one of whom was carrying a clear plastic bottle with a napkin or rag stuck in the top; the other was holding "something." A black Trans AM with tinted windows was parked nearby with its lights off and its motor running. She saw the boys ran down the subway steps, heard a loud "boom," and the duo ran back from the station. Then there was

another loud "boom." The boys were laughing, one said, "we got him," and they got into the passenger side of the Trans AM and left.

49.     In early December, a CI reported to the police that "Scarvey McCargo" and "Rocky Butler" (real names) had committed the crime and had been hired by "Stymie" and "Bo-Peep." The CI picked a photograph of McCargo.

50.     On December 7, 1995, while sitting in an unmarked car in front of Robinson's residence, Defendants Scarcella and Chmil showed her six photographs, including one of Scarvey McCargo. Overwhelmed with emotion, Ms. Robinson began screaming and crying, identifying McCargo as the youth with the clear plastic bottle.

51.     On December 8, 1995, Ms. Robinson gave a statement under oath in the presence of two ADAs and Defendant Chmil. She gave a more detailed, and conflicting, account but confirmed that McCargo was the youth with the bottle and that "I'll never forget his face as long as I live." She then identified a photograph of Rocky Butler as McCargo's companion.

52.     On December 13, 1995, the NYPD determined that Rocky Butler was in jail at the time of the murder. That should have discounted Robinson as a reliable witness. Further, for reasons never documented and currently unknown, the NYPD decided that McCargo was in or around Baltimore at the time the crime was committed, although he was never questioned and was not in custody. That determination should have furthered the conclusion that Robinson was simply not credible.

53.     Meanwhile, Ringy's name came up again on December 12, 1995, when an anonymous female reported that Ringy and "Kato" were responsible for the arson, and that

12

"Antwan" drove the getaway car. That same day, an anonymous male caller reported that Ringy was at his sister's apartment. When the police executed a search warrant, however, Ringy was not there. The police issued a wanted card for Ringy and created a photo array including his photo.[1]

54.     On December 13, 1995, Defendant Chmil interviewed a CI brought in by a police officer from the 88th precinct. The CI reported that one Ricardo James (Ricardo)[2] had confessed to committing the crime with "Tyrone,'" and the Zoe brothers, "Pop" and Pepe.

55.     The C.I. reported that both James and "Jefferson" admitted to committing the crime, and that she knew James from high school. She recounted that he told her that he, Jefferson, and the Zoe brothers planned to "hold up the booth with a gun" but "couldn't because of the glass, so went to 'Plan B'" and sprayed gas into the booth, at which point "the man's" clothes caught on fire. She further stated that the Zoe brothers were 22 to 23 years old.

56.     Later that evening, detectives conducted an identification procedure at the precinct. The confidential informant identified Ricardo as the person who had confessed to committing the crime.

---

[1] After the arrests of Malik, Ellerbe, and Irons, the "wanted" card for Ringy was cancelled on December 22, 1995. Finally, on January 18, 1996, Defendants Scarcella and Chmil got around to questioning Ringy, who denied that he had any involvement and was with his girlfriend. There is no indication that any corroboration of this was sought.

[2] Iron's first name is "James." To avoid confusion, Ricardo James is designated herein as "Ricardo."

57.     All this information concerning James and his confession was patently exculpatory and in the hands of law enforcement early in its investigation, yet none of it was disclosed to the defense at trial.

58.     The defense was not informed, for example, of James' confession, the existence or identity of the witness to the confession, the fact that the witness positively identified him as the perpetrator, or the fact that Defendants Scarcella and Chmil had been advised of the informant's naming of other alleged perpetrators.

59.     Nor was the defense provided with Detective Chmil's notes summarizing the informant's account of Ricardo's confession; Detective Mario Delucia's notes memorializing his interview of the informant, who again recounted that Ricardo admitted to committing the crime; or the results of the identification procedure during which the informant positively identified James.

60.     At about 11:30 p.m. on December 13, 1995, detectives brought Ricardo James to the precinct.

61.     The detectives also took Irons to the precinct. They had seen him in the neighborhood while looking for Ricardo.

62.     Defendants Scarcella and Chmil interviewed Ricardo at the precinct. *He admitted that he was present at the crime scene.*

63.     Before they could extract a confession from Ricardo (truthful or not), Defendants Scarcella and Chmil's interview was interrupted when the detectives were pulled away to interrogate Irons.

14

**B.** **Irons is Coerced into Giving a False Confession in which he Implicates Malik, Ellerbe, Chris, Eric, Andre, and Ringy (Ringo).**

64.     While Ricardo was being interviewed, Detective Michael Paul saw Irons in the waiting area of the precinct. Despite being minimally involved in the investigation up to that point, Detective Paul began questioning Irons, who informed him that he heard an explosion from his apartment window a few buildings away and on the opposite side of the street.

65.     Detective Paul, for no apparent or documented reason, did not believe Irons and delivered him to Defendants Scarcella and Chmil.

66.     Irons had significant cognitive deficits that were apparent to the detectives who marked Irons as someone from whom they could extract a false confession. During the interrogation, Defendants Scarcella and Chmil fed key details to Irons, including by showing him a photograph of the rifle found at the crime scene and describing and/or showing him a photograph of the gasoline container.

67.     Defendants Scarcella and Chmil also fed false facts to Irons, including their naming "Ringy" as being involved with the crime and claiming that it was Ringy who had shot Irons in the leg the previous year.[3] This story concerning Ringy was entirely false, and the fact that Irons has never been shot in the leg—by Ringy or by anyone else—is undisputed. Notably, Ricardo *had* previously been shot in the leg by Ringy.

68.     Defendant Scarcella and other detectives physically assaulted Irons and threatened him with a gun. One of the detectives removed a loaded revolver from his ankle holster

---

[3]     In the trial transcript, Ringy's name is spelled as "Ringie."

and brandished it, then dramatically removed the bullets from it and challenged Irons to take hold of the gun, which he refused to do.

69.     Finally, Defendants Scarcella and Chmil ultimately wrung a false confession from Irons and coerced him into signing a falsified handwritten statement and a falsified DD5 police report, both of which Defendant Chmil prepared. Among other notable (and completely false) aspects of the confession, Irons claimed that "Chris," "Andre," and "Eric" were involved in the planning of the robbery, along with Ellerbe and Malik. He claimed that he, Malik, Ellerbe, Eric, Andrew *AND* Ringy actually participated directly in the robbery. He claimed that Ellerbe gave him a .32 revolver, and that Ellerbe squirted gasoline near the token booth door, then immediately claimed it was Malik who did so.

70.     Following the hours-long interrogation late at night and into the morning by Defendants Scarcella and Chmil, Irons was then forced into giving a false videotaped statement, from 6:12 a.m. to 6:49 a.m., to Assistant District Attorney ("ADA") Lori Grifa.

71.     During the interview, rather than have Irons describe the alleged events in his own words, ADA Grifa primarily asked yes/no questions and provided the account herself, leaving Irons merely to agree or disagree. When Irons could not recall certain details that Defendants Scarcella and Chmil had previously fed him, ADA Grifa "assisted" Irons by inappropriately giving him clues and coaxing him into the response she wanted.

72.     Even with such prompting, Irons was unable to relate even the most basic facts or repeat what the detectives had included in the written statement.

73.     As a result, the videotaped statement was different in numerous, material respects from the written statement; internally contradictory; constantly changing; and confused.

74.     Irons was inconsistent about and had difficulty explaining, *inter alia*: (1) details about his alleged accomplices, including the number of accomplices, their names, and when and where he met them; (2) the planning of the crime, including when the first meeting took place, when the getaway car was first discussed, and when Ellerbe allegedly gave him a gun; (3) the roles that he and his alleged accomplices played during the commission of the crime; (4) the description of the plastic container of gasoline; (5) the words exchanged with the victim prior to squirting the gasoline and whether any money was demanded; and (6) the distribution of the gasoline and the lighting of the fire.

75.     For example, throughout the interview, Irons could not recall Malik's name, which, according to the written statement, Irons allegedly mentioned early and frequently when speaking with the detectives. Irons came up with Malik's name only after a half dozen failed attempts, and only after ADA Grifa flat out asked, "Could that be Tommy," once Irons hesitatingly said the name started with a "T."

76.     Irons then told ADA Grifa he knew Ringo (not Ringy) from a party he attended around Thanksgiving. When asked if he knew Ringo from anywhere else, Irons said he did not, despite having allegedly told Defendants Scarcella and Chmil just hours earlier that Ringy had shot him in the leg the year prior.

**C. <u>Vincent Ellerbe is Coerced into Giving a False Confession Implicating Malik, Irons, Andre, Chris, and Eric.</u>**

77.     Ellerbe was good friends with Malik but was only passingly acquainted with Irons from the neighborhood. Ellerbe was 17 years old at the time of the crime. He had no criminal convictions. Sometime near the end of October 1995, he began staying with his

girlfriend in Binghamton, New York. He was with her, there, the night of the attack. He remained there until he was arrested on December 14, 1995.

78.    On or about December 14, 1995, he received a call when he was in Binghamton from his grandmother, telling him to call his mother. He did so and his mother relayed that the police were looking for him regarding the token booth robbery/murder. He contacted a detective and told him he would immediately return to Brooklyn.

79.    He returned to Brooklyn and went to the 79th precinct voluntarily, to clear his name, accompanied by his mother and sister.

80.    He was taken into an interview room and informed a detective that he had nothing to do with the token booth incident, that he was not even in town. Then Detective Anthony DeRita took over the interrogation.

81.    After Defendant DeRita failed to elicit a confession from Ellerbe by playing "good cop," he grabbed Ellerbe by the shirt and threatened him. Ellerbe continued to proclaim his innocence. Defendant DeRita then slammed his face on the table and continued to demand a confession. Finally, Detective DeRita pulled out his gun and pointed it at Ellerbe, then slammed him into a wall.

82.    Ellerbe repeatedly called for his mother.

83.    Detective DeRita continued to  coerce Ellerbe until he agreed to sign a statement that had been written out for him. Detective DeRita ordered him to sign it. Ellerbe then confessed on videotape.

84.    These two confessions differed from each other and differed from the evidence in important respects. Ellerbe stated that he sprayed gasoline from a white, spray top bottle

18

that Irons had given them. And indeed, police recovered a white-appearing spray-top bottle from the subway station. That bottle, however, was filled with glass cleaner, found in a different area of the station, and had nothing to do with the crime. The bottle that actually contained the gasoline was a clear plastic soda bottle with no top. Moreover, the conduct that Ellerbe claimed to have done—spraying his "tag" on the front of the booth—could not have caused the booth to explode.

85.     Ellerbe's description of the number of participants and their conduct was wildly inconsistent with the very detailed account given by Kaufman. Ellerbe's description of Irons shoving a .32 revolver into the slot was physically impossible. Indeed, by the time Ellerbe gave his videotaped confession, he had forgotten enough that the CRU ultimately concluded that "he was trying to remember a script, as opposed to recalling an actual memory."

### D.  Malik is Coerced into Giving a False Confession.

86.     Malik was arrested on December 14, 1995, and was taken into an interrogation room at the 79th precinct in the company of Defendants Scarcella and Chmil. He was 18 years old. He insisted that he spent the night of the robbery and murder with his girlfriend and proclaimed no knowledge of the crime.

87.     Over the course of more than four hours, Defendants Scarcella and Chmil interrogated Malik. Defendant Scarcella repeatedly cursed and shouted at Malik, called him a "fucking coward" and a "fucking liar" numerous times in the face of Malik's denial of involvement. Escalating his behavior, Scarcella smashed his fist into a set of wall lockers, slammed Malik's head into a locker, told Malik he would "get the needle for this,"

paraded Ellerbe in front of him, and showed him Ellerbe's false confession. Finally, Defendant Scarcella was able to "break" Malik by threatening to arrest his mother for harboring a fugitive. His mother, who accompanied him to the precinct, was outside, and he could hear her crying. Malik signed a written confession that had been prepared by Scarcella and provided a version of it on videotape. The very first words of his coerced confession were "O.K. man, I was there…." These words were identical to those allegedly uttered by over a half dozen other defendants who allegedly confessed to Scarcella, who have had their convictions reversed.

88.    Defendants Scarcella and others provided important details and information to Malik in order to make his confession appear truthful. They brought Ellerbe into the room before Malik had said anything about Ellerbe. They showed him photographs of Irons although he had not mentioned Irons. They told him about the gun recovered at the scene and that a burnt glove was recovered from the scene—facts which he had said nothing about. Detective Scarcella specifically fed him information that the "getaway car" was a blue Ford Taurus, something that did not appear in Malik's written statement. On the videotape, the prosecutor also suggested important information about the case, including when the defendants met up to plan the robbery.

89.    Malik's confession was also wildly inconsistent with the confessions of Ellerbe and Irons.

90.    Ellerbe and Irons said the group met in front of Irons' building on Fulton Street. Malik, who did not know Irons and had no idea where he lived, said they met in the front of 400 Herkimer Street.

91.     Irons stated in writing that Ellerbe gave him a .32 gun when they met to plan the crime, yet in his videotape stated that it happened in front of his residence just before the crime. Malik said nothing about giving Ellerbe a gun or Ellerbe giving Irons a gun.

92.     Irons described the bottle as a squeeze bottle. Ellerbe described it as a white spray bottle. Malik described it as a soda bottle.

93.     Irons claimed that he, Ellerbe, Eric, and Ringo had handguns and Malik had a rifle. Ellerbe said that only Irons had a gun, which both Ellerbe and Irons said Ellerbe provided. Ellerbe never mentioned a rifle. Malik said that only Ellerbe had a gun and never mentioned a rifle.

94.     Irons and Ellerbe said the crime was planned on Sunday morning. Malik said that it was supposed to take place on Friday.

95.     Irons said seven people participated. Ellerbe said six. Malik said five. Notably, the victim saw only two participants, and no one claimed to see more than three people running from the subway station.

96.     Irons said that Ellerbe and Malik approached the booth. Ellerbe said that he, Irons, Malik, and Chris approached the booth. Malik said that Irons and Ellerbe approached the booth. Regardless, the descriptions of the two men given by the victim did not match any of the three defendants.

97.     Irons claimed that Chris stayed in the car during the robbery. Ellerbe said that Chris was standing next to him during the robbery. Malik never mentioned Chris.

98.     Irons said Ellerbe told him about the car, and that Eric and Chris were inside the car. Ellerbe said nothing about the car or Eric. Malik said no one was in the car.

99.   Irons said that Chris stayed in the car and Ellerbe and Malik were in front of the booth. Ellerbe said Chris was standing next to him in front of the booth, with Irons and Malik. Malik said that only Irons and Ellerbe were in front of the booth.

100.   In his written statement, Irons claimed Ellerbe squirted gasoline in the change slot and Malik squirted gasoline near the door, but in his videotaped statement, he blamed Ellerbe for both the slot and the door and did not mention Malik squirting gasoline at all.

101.   Ellerbe stated that he sprayed gasoline on the token booth window and did not mention anyone else having gasoline or using it.

102.   Malik said that Irons squirted gasoline.

103.   In total, this trio of confessions coerced hours apart from each other failed to coalesce into anything that could be even a remotely true narrative of the crime.

   E.   **Lineups: Robinson Makes New Identifications**

104.   On December 15, 1995, Williams, who previously described two "light skins" and a darker-skinned heavier man who appeared to be injured, viewed a lineup containing Malik. She could not identify anyone.

105.   On December 16, 1995, Robinson, who so passionately insisted upon Scarvey McCargo's face as the one she would never forget as long as she lived, identified Malik as the man she saw carrying the plastic container going into the subway, then fleeing and laughing. She identified Ellerbe as the man she previously insisted was Rocky Butler.

106.   Defendants Scarcella and Chmil finally had their eyewitness.

   F.   **Serial Perjurer Marlon Avila, a/k/a Rayquan Shabazz, Enters the Frame.**

107.   New Year's Day, 1996, arrived with Marlon Avila, a/k/a "Rayquan Shabazz," (Shabazz) in his customary location—behind bars. This time, he was on Riker's Island awaiting trial. As in prior and future stays, Shabazz wanted to get out as quickly as possible. On January 2, 1996, he contacted the KCDA Homicide Bureau Chief Kenneth Taub, whose number he carried with him. He knew Taub from a previous case where he had testified for the prosecution in a case. He had also testified in Queens County in yet another homicide case. Here, as in those cases, he claimed that he won the trust of the defendants, and they confessed their crimes to him.

108.   Putting aside what should have been the natural inclination to carefully scrutinize such information from a serial jailhouse informer, Shabazz's story itself was internally inconsistent. Among other things, he claimed Malik told him that Irons sprayed the token booth door using a squeeze bottle, and Malik lit the matches. Then, he claimed Malik said Irons sprayed *inside* the booth, and Malik ignited it. There was no evidence of two separate ignitions. Shabazz claimed Malik said that Irons refused to spray inside both, so Malik did it. According to Shabazz, Malik implicated Irons, Ellerbe, Ringy, a new person--"Julies" --and "others."

109.   No such scrutiny took place. Instead, over the next months, Shabazz reported that that Malik had enlisted him to harm Irons, through an elaborate conspiracy. Shabazz aided the prosecution in taping Malik's statements and calls toward this end. Despite all of the tapes, Malik never admitted his guilt to the underlying crime, or otherwise implicated himself. He was furious that Irons had implicated him in something he had nothing to do

with. Nonetheless, Shabazz was to testify against Malik and report the unrecorded jailhouse confession.

110.   *Taub certainly knew, but did not inform the defense, that in his prior work with Shabazz, Shabazz admitted on the witness stand that he "lied for a living."* The defendant in that case was acquitted and his record sealed. The prosecution never disclosed the name of the case or the participants, making it impossible to learn of, let alone obtain, this testimony.

### G. **Trial, Conviction and Sentence**

111.   Ellerbe and Malik were tried together, before different juries so that their inculpatory statements could not be used against the other. Irons was tried separately. Accordingly, there was no way for any of the juries to compare the confessions and for the defense to point out their inconsistencies. Malik and Ellerbe were convicted on November 27, 1996. Malik was sentenced on December 17, 1996, to the maximum term of 25 years to life. His conviction was affirmed on appeal. People v. Malik, 265 A.D.2d 577 (2d Dept. 1999), leave denied, 94 N.Y.2d 904.

### H. **The Re-Investigation**

112.   At some point in February of 2013, Malik obtained a copy of an extraordinary injunction issued against Rayquan Shabazz in his criminal case, issued by a New York County State Supreme Court Justice. Spanning ten pages, the Court found that Shabazz repeatedly lied to various police and prosecutorial officials, created murder conspiracies for the purpose of turning in his "co-conspirators" in exchange for a more favorable

sentence, and constituted a "clear and present danger" to the administration of justice to the extent that he was enjoined from ever contacting anyone in law enforcement ever again. Any attempt to contact law enforcement about anything, real, imagined, or cooked up, had to be made through a Special Master designated for that purpose.

113.    That injunction was forwarded by Malik's counsel to Homicide Bureau Chief Ken Taub, who forwarded it to the new Conviction Review Unit, started under DA Charles Hynes, that was undertaking its first review of another Scarcella case, that of David Ranta.

114.    The review that followed took place under three administrations and lasted over nine years. It was the most thorough and comprehensive review in the history of the unit.

115.    The CRU made extensive factual findings regarding all of the evidence used against Malik. Regarding Malik's confession, the CRU retained the services of Saul Kassin, PhD, arguably the world's foremost authority on coerced and false confessions, and eyewitness identifications. Without considering Malik's statements that he had been threatened and assaulted, and relying solely on the undisputed records of the case, Dr. Kassin found:

- Malik had been subject to interrogation techniques known to induce confessions from innocent people.
- Malik's confession did not offer any proof of "firsthand guilty knowledge." That is, it did not contain any information not known to the police and it did not lead the police to any truthful evidence they did not already possess. There was substantial evidence that the confession was contaminated, and Malik and his two co-defendants did not tell a single, coherent story.
- External corroboration of Malik's confession was "weak to non-existent, if not outright suspicious." There was no physical evidence and the two witnesses who testified against Malik, Robinson, and Shabazz, were highly compromised.
- The interrogation of Malik was a "classic example of a guilt-presumptive interview aimed not at an objective search for truth but as a confirmation of prior beliefs."

- Finally, Dr. Kassin found that in the lineup shown to Robinson, Malik was the only one wearing a red shirt "the kind of biasing distinctiveness cue that was well known at the time and should have been avoided."

116.    The CRU determined that the confession was not credible.

117.    The CRU also recited the now familiar litany of Defendant Scarcella's elicitation of false confessions and manipulation of witnesses, noting that defense efforts to question Scarcella about the few of these matters known to counsel at the time (including Scarcella's quote "I do what I want with my prisoners") encountered improper objections from the prosecution that were sustained by the trial court.

118.    The CRU also addressed Robinson's testimony, noting that her initial identification of Scarvey McCargo and Rocky Butler as the men who became Thomas Malik and Vincent Ellerbe should have "severely" undermined her identification of Malik. Her attempts to explain her prior misidentification at Malik's trial "appears fabricated." The CRU concluded that given the passion and certainty with which she identified McCargo and Rocky Butler, prosecutors should never have had her even view a lineup containing the defendant. By the time Malik was arrested, concluded the CRU, her utility as an eyewitness was "exhausted."

119.    Perhaps even more important, after a detailed location mapping, the CRU concluded that Robinson was not parked where she claimed to have been parked, was likely a block away, and could not have seen and heard what she claimed.

120.    The CRU learned that Robinson perjured herself when she described what she was doing in the car—"talking to a friend." In fact, she was with her boyfriend, having sexual

relations in the car at the time, and she fled the scene after the explosion because she was concerned the man with whom she lived with might find out about her boyfriend. Although she ultimately admitted this to the police, this information was never provided to the defense and would have undercut, at a minimum, her testimony that she was just casually watching people go by on the street. Robinson refused to give police the name of her boyfriend so they could corroborate or debunk her account, and prosecutors refused to compel her to do so before the grand jury. Defense efforts to learn this were met by objections from the prosecution that were sustained by the trial court.

121.    The CRU re-interviewed Robinson. The account that she provided to them was inconsistent with her prior testimony, but remarkably consistent with that of Darlene Williams, who did not identify Malik and gave a description of the perpetrators that did not match him. The CRU concluded that "Robinson's ever-changing story, from her initial contact with the police through trial, was not reliable."

122.    As to Rayquan Shabazz, the CRU conducted a thorough investigation of him and his testimony, concluding that he was "an utterly unreliable informant." The CRU noted that Shabazz had provided false information multiple times subsequent to his testimony against Malik, that his initial statements to police "appear to be cobbled together from newspaper articles" and from the statements made by Irons and Ellerbe - many of which were ultimately contradicted by the physical evidence, incorporated "Julies" into the narrative (a fifteen year old boy who had nothing to do with the case, except that he was named in passing by Ellerbe), and perjured himself at Malik's trial when testifying about some non-existent plot to smuggle razor blades to Malik.

27

123.    Further undercutting his testimony, the Prisoner Movement Logs showed that Malik, Ellerbe, and Shabazz were simply not in the same location at Rikers when Shabazz claimed to have had conversations with them. The CRU found these were "fictional events."

124.    Finally, the CRU concluded that standing alone, Scarcella's now known misconduct would have undermined the confession and identification. However, even without Scarcella's involvement, "defendant's confession, Robinson's testimony, and Shabazz's testimony are unreliable," the CRU has no confidence in the integrity of the conviction, and "there is no reliable evidence of guilt.

## I.  **Exoneration**

125.

126.    On July 15, 2023, after almost twenty-seven years of incarceration, KCDA and the defense jointly moved to vacate the conviction and dismiss the indictment. The motion was granted, and Malik walked out a free man.

## INVESTIGATIVE REPORTS ON INSTITUTIONAL DEFICIENCIES WITHIN THE NEW YORK CITY POLICE DEPARTMENT AND THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE.

127.    Reports from several independent bodies demonstrate that Defendant the City of New York, during the relevant period, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the NYPD and KCDA. This culture allowed employees of the NYPD and KCDA to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

128.    On July 7, 1994—just a year and a half before Malik's arrest—the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Commission") issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD.[4] The Mollen Report investigated the 1980s and 1990s through the date of the report's publishing. Importantly, the Mollen Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight." Mollen Report at 1.

129.    The Mollen Report further noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." *Id.* at 36. The Mollen Report described police falsifications as "probably the most common form of police corruption facing the criminal justice system," *id.*, and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful," *id.* at 41.

130.    The Commission noted that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," *id.*, and found that "[t]here is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police

---

[4]   The Mollen Report is available at http://bit.ly/3qyKkKv.

Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics," *id.* at 41-42. Given this situation, the Mollen Report determined that "successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it." *Id*. at 79.

131.    The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications . . .. [T]he Department's top commanders must share the blame." *Id.* at 41.

132.    This Court has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.'" *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014). Accordingly, this Court has found that "[t]he Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]" *Id.* at 191.

133.    The lack of discipline documented in the Mollen Report continues to this day, as demonstrated by a report released by The Independent Panel on the Disciplinary System of the New York City Police Department (the "Panel"), chaired by the Honorable Mary Jo White, the Honorable Robert L. Capers, and former United States District Court Judge for

the Southern District of New York Barbara S. Jones.[5] The Panel's report (the "Panel Report"), released in January 2019, made specific note of the endemic culture of false testimony in the NYPD, which was repeatedly "brought to the Panel's attention." Panel Report at 38.

134.    The Panel noted that while "the Patrol Guide provisions . . . expressly forbid officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty." *Id.* at 39. The Panel "share[d] the concern that the Department does not do so and treats false statement cases too leniently," *id.* at 40, particularly as several stakeholders "told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge," *id.*, and another "stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned," *id.* at 41.

135.    Furthermore, in 2009, the New York State Bar Association's Task Force on Wrongful Convictions (the "Task Force") released an investigative report covering 53 cases (the "NYSBA Report").[6] The Task Force found that "government practices" contributed to more than 50% of the wrongful conviction cases studied. NYSBA Report at

---

[5].   The Panel Report is available at https://www.independentpanelreportnypd.net.
[6] As noted in the NYSBA Report, available at http://bit.ly/3OVlxtf, the cases spanned from 1964 to 2004, a forty-year period that includes Irons' arrest in 1995 and conviction in 1996. Most of the cases were from New York City. Many were from Brooklyn. NYSBA Report at 186.

136.   These practices included: (a) the use of false evidence; (b) the failure of the prosecutor to disclose *Brady* material; and (c) "the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime." *Id*. All of these practices contributed to Malik's wrongful conviction, where: (a) Malik's conviction was based on an unreliable, coerced confession that was internally inconsistent, inconsistent with the confessions of the others, and inconsistent with the physical evidence, solely on his false confession procured by Defendants Scarcella and Chmil; (b) the presentation of patently unreliable witnesses, (c) the prosecution withheld from the defense that James, one of the prosecution's witnesses, had previously confessed to the crime to a police informant; that Ms. Robinson had promised that she would not have to disclose the name of her boyfriend and was permitted to perjure herself when she claimed she was merely talking with a friend, and that Rayquan Shabazz had previously testified in a Kings County case that he lied for a living, and (d) Detective Scarcella, having been told that Malik had participated in the robbery/murder, rejected his truthful and innocuous explanation of his whereabouts at the time of the crime, and the police thereafter eliminated, with no explanation, other early leads as suspects.

137.   The Task Force recommended that police and prosecutors be trained and supervised in the application of *Brady* and truthful evidence rules. *Id*. at 37-38. Indeed, the Task Force observed that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show [that *Brady* violations] still occur []." *Id.*

at 26 (collecting New York cases). The Task Force therefore suggested that, to the extent not already in existence, prosecutor's offices should implement internal procedures for preventing *Brady* and truthful evidence rule violations, for evaluating whether a prosecutor has engaged in misconduct, and for imposing sanctions for any such misconduct. *Id.* at 29. The Task Force also noted the importance of the police in upholding *Brady* obligations, given that "[p]rosecutors' access to exculpatory evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38.

138.    As discussed below, despite the significance of the *Brady* rule, neither the NYPD nor the KCDA had appropriate training, supervisory, or disciplinary procedures in place in the time leading up to Irons' arrest, indictment, trial, or post-conviction litigation.

## A. Demonstrated History of Police Misconduct by Defendants Louis Scarcella and Stephen Chmil.

139.    These investigative reports revealed a laissez-faire NYPD regime and a stunning pattern of falsification. These findings are illustrated by the conduct of Defendants Scarcella and Chmil.

140.    Scarcella openly bragged, in a 2007 episode of the *Dr. Phil* television show, that he did not "play by the rules" as a homicide detective.

141.    Through the years, Scarcella has admitted under oath to attaching dollar bills to his business card, which he said helped to get tips on crimes; habitually writing suspects' confessions in his own hand because he "found that it makes them very uncomfortable" to

do so themselves; and lying to suspects that he had evidence he did not, in fact, have—all plainly dubious practices.

142.    In July 2019, in a Kings County Supreme Court hearing to overturn Eliseo DeLeon's murder conviction, Chmil testified that he and Scarcella "used some questionable tactics."

143.    After Scarcella and Chmil were caught on video in 1992 removing an informant from jail for an unauthorized outing to meet his girlfriend, go shopping, and dine in restaurants, Chmil admitted that he and Scarcella "shouldn't have done it" and that "[i]t was improper."

144.    In 2014, at a hearing where the Kings County Supreme Court granted a joint motion by Hill and the KCDA to vacate Hill's conviction, a prosecutor from the CRU described the eyewitness against Hill, Theresa Gomez, as an "extremely problematic witness" and "a troubled young person, hopelessly addicted to drugs, criminal in her conduct for the most part, increasingly erratic in terms of her accounts."

145.    Notwithstanding clear signs of her extreme unreliability as a witness, Scarcella used Gomez as a witness in at least *six* separate murder cases. In addition to Hill, at least two other men identified by Gomez— Hill's half-brothers Darryl Austin and Alvena Jennette— have had their convictions cleared after the CRU reinvestigated the Scarcella-related cases and determined that Gomez was not credible.

146.    Chmil likewise hinged his cases on unreliable witnesses who were heavily addicted to drugs and easy to manipulate.

147.    Chmil was the lead detective on a homicide case that resulted in the 1987 conviction of Valance Cole. Cole's conviction was based largely on the testimony of Jeffrey

Campbell, an individual addicted to crack cocaine who had been arrested earlier for a separate robbery. Years later, while dying from AIDS, Campbell recanted and said that Chmil promised that his robbery charges would be dropped if Campbell testified against Cole. Chmil, Campbell said in a sworn statement, went so far as to give him a script.

148.   In 2003, a judge denied Cole's motion to vacate his conviction but found that Cole was "probably innocent." In addition, another suspect has come forward and confessed to the crime in detail no less than four times since 2007.

149.   Chmil has conceded the similarity between Campbell and Gomez (the witness Scarcella used repeatedly in his cases), stating that "Campbell was a lot like her" and that "[s]ometimes he'd tell you the truth, sometimes he wouldn't."

150.   An investigation by the KCDA showed that Defendants Scarcella and Chmil also made a habit of withholding reports for weeks if they did not want prosecutors or defense lawyers to know about a particular suspect.

151.   These are indicia of unprincipled detectives. Indeed, allegations over the last several years indicate that Defendants Scarcella and Chmil engaged in a pattern of corrupt, unconstitutional, and dishonest police practices before and during the time that they were detectives on the instant case.

152.   The 1995 investigation by Defendants Scarcella and Chmil that resulted in Irons' conviction falls within a judicially recognized window of the detectives' misconduct. As Judge ShawnDya L. Simpson noted in her opinion vacating Rosean Hargrove's 1992 conviction, Scarcella "was at the time of the investigation engaged in false and misleading practices. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette, and

35

Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this pattern and practice." *People v. Hargrove*, 2015 N.Y. Misc. LEXIS 3691, at \*24-25 (Sup. Ct. Kings Cty. Apr. 14, 2015).

153.   As noted above, nearly 20 homicide convictions associated with Defendant Scarcella have been vacated to date; Defendant Chmil, as Scarcella's longtime partner, was involved in a number of those convictions. At least nine of those convictions—those of Malik and his co-defendants, Messrs. Ellerbe and Irons, Eliseo DeLeon; David Ranta; Shabaka Shakur; Vanessa Gathers; Jabbar Washington; and Sundhe Moses—have been vacated where Defendant Scarcella, many times with the assistance of Defendant Chmil, coerced false confessions or fabricated written confessions from innocent individuals.

154.   As also noted above, numerous false confessions taken by Defendant Scarcella— those of David Ranta, Shabaka Shakur, Jabbar Washington, and Hector Lopez—contain the same or similar language as that allegedly used by Malik when he falsely confessed.

155.   During Defendant Scarcella's heyday and today, judges have decried his various forms of misconduct.

156.   In the 1987 trial of James Jenkins, Justice Francis X. Egitto condemned Scarcella for his manipulative conduct of an identification procedure. This included allowing the witnesses to mingle together and telling the witnesses, "We have the guy that committed the murder."

157.   In vacating the conviction of Rosean Hargrove, Judge ShawnDya L. Simpson stated "[t]he patterns and practice of Scarcella's conduct . . . manifest[s] a disregard for rules, law

and the truth." *People v. Hargrove*, 2015 N.Y. Misc. LEXIS 3691, at *25 (Sup. Ct. Kings Cty. Arp. 14, 2015), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

158.  In vacating Shabaka Shakur's conviction in May of 2015, Judge Desmond Green determined that Scarcella has a "propensity to embellish or fabricate statements."

159.  The vast number of cases alleging Defendants Scarcella's and Chmil's misconduct is itself evidence that the NYPD knew of and ignored their unconstitutional practices. As of 2018, the KCDA pledged to review over 70 of Scarcella's cases for possible misconduct. Chmil, as Scarcella's longtime partner, was also involved in many of those cases. Of the nearly 20 Scarcella-related convictions that have been vacated, the KCDA has agreed to the vacatur at least 13 times.

160.  A media favorite during his career and a legend within the NYPD, Defendant Scarcella's conduct could not have escaped notice. The *Daily News*' Pulitzer Prize-winning columnist Mike McAlary wrote in 1996 that "[i]n big cases, they bring in Scarcella." Scarcella rose to the highest rank of First Grade Detective, and, upon information and belief, won numerous "Outstanding Police Investigation" awards from the Chief of Detectives.

161.  Given their notoriety and the number of known instances of misconduct that occurred in the presence of other police officers and supervisors—some of whom participated in the misconduct with Defendants Scarcella and Chmil—it is a near certainty that the NYPD knew of their deliberate or reckless conduct and either encouraged it or failed to train, supervise, or discipline for said conduct.

162.  City officials outside the NYPD also were aware of Defendants Scarcella's and Chmil's misconduct but remained willfully blind to it. Indeed, a top prosecutor in 2013 disclosed that even those who respected Scarcella became skeptical of him after, as discussed above, he was caught on video in 1992 removing an informant from jail for an unauthorized outing. KCDA officials have acknowledged, however, that they mostly kept quiet about their concerns, given Scarcella's popularity with their supervisors.

163.  This enabling culture permitted and caused the wrongful prosecution and conviction in Malik's case.

164.  Defendant Scarcella himself testified during the CPL Section 440.10 motion hearing of Shabaka Shakur (who succeeded on his claim that Scarcella fabricated his confession) that there was essentially no oversight and supervision of Brooklyn homicide detectives in the 1980s: they could take cases as they wished and investigate them in whatever manner they desired. Scarcella thus admitted that the NYPD maintained a laissez-faire policy, pattern, practice, and custom when it came to its homicide detectives. Their constitutional violations would go unmonitored, unchecked, and undisciplined.

165.  The full scope of the misconduct of Defendants Scarcella and Chmil has yet to be fully determined, even more than a decade after the Ranta case. As recently as November 3, 2023, The CRU exonerated Deltroy Livingston after he served over three decades of

imprisonment. The exoneration was due, in part, to investigative and witness misconduct by Defendant Chmil.[7]

### B. Other Case Studies in Improper Police Conduct

166.   Importantly, Defendants Scarcella and Chmil are not isolated cases of detectives gone rogue. Additional proof of a culture of unconstitutional conduct in the NYPD at that time exists in the voluminous record of other Brooklyn cases—not involving Scarcella—that demonstrate that other Brooklyn homicide detectives felt free to act similarly. This pattern of behavior beyond Scarcella supports a clear inference that unscrupulous tactics were considered normal, acceptable, and encouraged within the Brooklyn homicide squad, as demonstrated in the following cases:

167.   **David McCallum and Willie Stuckey:** In October 1985, Brooklyn Detective Joseph Butta allegedly coerced false confessions from David McCallum and Willie Stuckey through the use of physical intimidation, including slapping McCallum in the mouth and drawing blood; threats of physical intimidation, including picking up a chair and threatening to hit McCallum across the head with it; and promises of leniency, including telling Stuckey that he could go home if he only cooperated ("Q. And what did he tell you would happen to you if you said those things? A. He told me he was going to call my house and he's going to let me go."; "Q. And right after you made the tape, did you think you were going home? A. Yes."). Both men recanted immediately and, tellingly, both

---

[7]

http://www.brooklynda.org/wp-content/uploads/2023/11/Livingston-PUBLIC-VERSION-110223.pdf

confessions contained inconsistencies, false fed facts, and fabrications. Messrs. McCallum's and Stuckey's motions to vacate their convictions were granted on October 15, 2014, absent objection from the KCDA.

168. **Antonio Yarbough and Sharrif Wilson:** On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother, 12-year-old sister, and 12-year-old family friend had been savagely tied up, stabbed, garroted with electrical cords, and murdered. Yarbough, who reported the crime to the police, and his 15-year-old friend Sharrif Wilson, confessed to the murders later that day. Each was convicted (in Yarbough's case after a second trial, the first ending in a mistrial) and served nearly 22 years in prison before DNA evidence ruled both men out as the perpetrators. In 2014, a Kings County Supreme Court Justice granted their motion to vacate, absent objection from the KCDA. According to a federal civil rights complaint filed by Yarbough, the NYPD allegedly used a combination of physical and psychological coercive techniques to secure the confessions, the latter including sleep deprivation, false evidence ploys, and false promises of leniency, including allegedly telling Wilson that they would let him go home if he would only tell them what they wanted to hear.

169. **Colin Warner:** Colin Warner was convicted in 1982 of the 1980 fatal shooting of Mario Hamilton. The victim's brother, Martell Hamilton, asserted that a member of the NYPD pressured him into picking out a photograph of Warner as someone he may have seen near the scene of the crime. Warner's motion to vacate his conviction was granted in 2001, absent objection from the KCDA.

170. **Barry Gibbs:** Barry Gibbs was convicted in 1988 of the murder of Virginia Robertson. Gibbs was exonerated in 2005 after the sole eyewitness, David Mitchell, recanted his line-up and trial identifications of Gibbs. Mitchell asserted that NYPD Detective Louis Eppolito had threatened his family if he did not identify Gibbs.

171. **Derrick Deacon:** Derrick Deacon was convicted in 1989 of the murder that same year of Anthony Wynn. Colleen Campbell was an eyewitness who saw the shooter in the hallway of the apartment building where the shooting took place, and who gave a physical description of him to the NYPD. When the NYPD identified Deacon as a suspect, Campbell told police the shooter was not Deacon, a man she knew from the neighborhood. Although she was called as a defense witness at trial to testify to that effect, she wavered on the stand and said she could not be sure. Years later, she testified in exoneration proceedings that the NYPD pressured her prior to her testimony, threatening her with the loss of her children if she did not cooperate with them. Although Deacon lost his motion to vacate at the Supreme Court level, the Appellate Division reversed, the case was re-tried in 2013, and he was acquitted.

172. **Jonathan Fleming:** Jonathan Fleming was convicted in 1990 of the 1989 fatal shooting of Darryl Rush. Jacqueline Belardo, a key prosecution witness, testified at Fleming's trial that she witnessed the shooting and recognized Fleming as the shooter. That testimony was false. Belardo later recanted her testimony and asserted that she agreed to identify Fleming at trial only after police officers threatened her with jail time on an unrelated felony larceny charge. Her recantation was corroborated by evidence of that

larceny arrest and the charge's subsequent dismissal. Fleming's motion to vacate his conviction was granted in 2014 absent objection from the KCDA.

173. **Carlos Davis:** In 1991, after being charged with the 1988 murder of Norris Williams, Carlos Davis was acquitted of the murder charge but convicted of criminal possession of a weapon. It was later determined that Christina Smith, the sole alleged eyewitness who testified against Davis at trial, lied about her identity, contradicted grand jury testimony of several eyewitnesses who later refused to testify at trial, may have had an undisclosed relationship with the victim's brother, and came forward only after a judge warned prosecutors mid-trial that she would be dismissing the case for lack of evidence. Desperate to save their criminal case, prosecutors and an NYPD sergeant allegedly located Smith (whose actual name was Kristie Hayes) and fed her a false narrative to use at trial. The KCDA joined in Davis's motion to vacate his conviction in 2015, after the CRU interviewed Smith/Hayes and determined that she lacked credibility.

174. Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs, and usages of the NYPD may be further inferred from numerous cases in which the NYPD violated its *Brady* obligations, and the NYPD turned a blind eye to officer dishonesty, as demonstrated in the following cases:

- *People v. Cortez*, 149 Misc. 2d 886 (Crim. Ct. Kings Cty. 1990) (dismissing indictment after finding that police violated "spirit" of *Brady* by intentionally destroying tape they were court-ordered to preserve, and that KCDA shared responsibility in tape destruction);
- *People v. Moss*, 176 A.D.2d 826 (2d Dep't 1991) (reversing drug sale conviction and ordering new trial for *Rosario* violations, where officers lost or destroyed pieces of paper providing contemporaneous description of seller);
- *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992) (ordering new trial for *Brady* violations, where prosecution withheld police report providing description of suspect that

did not match defendant's and that "was wholly at odds with the testimony given by [the arresting officer]");

- *People v. Nikollaj*, 155 Misc. 2d 642 (Sup. Ct. Bronx Cty. 1992) (ordering new trial for *Rosario* violations, where police failed to turn over numerous inconsistent statements of complainant officers);

- *People v. Dunn*, 185 A.D.2d 54 (1st Dep't 1993) (reversing conviction in part where, among other things, detective destroyed his investigative notes);

- *People v. White*, 200 A.D.2d 351 (1st Dep't 1994) (reversing conviction where police report containing *Brady* and *Rosario* material was withheld and only discovered through defendant's post-conviction Freedom of Information Law requests to NYPD and Bronx County District Attorney's Office);

- *People v. Morrow*, 204 A.D.2d 356 (2d Dep't 1994) (reversing conviction where significant portion of police report was not disclosed);

- *People v. Brogdon*, 213 A.D.2d 418 (2d Dep't 1995) (reversing conviction where NYPD sergeant destroyed his notes, and where identification by undercover officer "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive");

- *People v. Joseph*, 86 N.Y.2d 565 (1995) (reversing conviction and finding adverse inference instruction to be appropriate where police deliberately destroyed envelopes into which officers had placed cocaine vials seized from defendant);

- *People v. Anderson*, 222 A.D.2d 442 (2d Dep't 1995) (reversing conviction where officer's scratch notes were lost or destroyed due to officer's "lack of due care");

- *People v. White*, 232 A.D.2d 436 (2d Dep't 1996) (reversing conviction where officer lost his memo book through lack of due care);

- *People v. Jackson*, 237 A.D.2d 179 (1st Dep't 1997) (reversing conviction where police withheld Internal Affairs Division reports containing entries "that were significantly at variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused");

- *People v. Gallman*, 240 A.D.2d 512 (2d Dep't 1997) (reversing conviction for failure to disclose notes of police interview with prosecution's key witness);

- *Gurley v. City of New York*, 95-CV-2422 (E.D.N.Y.): Settled in 1997 for $1,750,000, where conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including NYPD ballistics report; complaint alleged that NYPD had longstanding policy of deliberate indifference to constitutional requirements that exculpatory evidence be preserved and disclosed to defendants;

- *Napoli v. City of New York*, 97-CV-1255 (E.D.N.Y.): Settled in 1999 for $60,000, where plaintiff was arrested on weapons possession and assault charges based on false grand jury testimony by NYPD officers; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights;

- *Jefferson v. City of New York*, 98-CV-1097 (E.D.N.Y.): Settled in 1999 for $175,000, where plaintiff corrections officer was arrested on drug charges without probable cause,

and charges remained pending for five months before grand jury returned no true bill; complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during prosecution;

- *Sweazie v. City of New York*, 99-CV-419 (E.D.N.Y.): Settled in 1999 for $20,000, where plaintiff was arrested on weapons possession charges, prosecution continued based on NYPD officers' false statements in felony complaint, and charges were dismissed when grand jury voted no true bill;

- *Crespo v. City of New York*, 93-CV-8847 (S.D.N.Y.): Settled in 1996 for $25,000, where plaintiff was arrested without probable cause on weapons possession charges; complaint alleged *Monell* claim based on NYPD's "foster [ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals";

- *Gordon v. City of New York*, 97-CV-8035 (S.D.N.Y.): Settled in 1998 for $40,000, where plaintiff was arrested without probable cause based on false allegations in felony complaint made by NYPD officers, and charges were dismissed by prosecutor three months after arrest; and

- *Lovell v. City of New York*, 00-CV-2 (S.D.N.Y.): Settled in 2000 for $40,000, where plaintiff was arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to Internal Affairs Bureau and Civilian Complaint Review Board.

### C. <u>Former District Attorney Charles Hynes's Deliberate Indifference to the Prosecutorial and Investigative Misconduct Occurring in His Office.</u>

175. During the relevant period, misconduct by the NYPD went hand in hand with misconduct by the KCDA.

176. Indeed, the post-conviction litigation of *Collins v. City of New York*, 11-CV-766 (E.D.N.Y.), revealed that at the time of Irons' arrest and conviction, the KCDA had no procedure in place to discipline prosecutors for violating their *Brady* obligations. It further revealed that the KCDA was deliberately indifferent to or endorsed *Brady* violations generally. The *Collins* case concerned *Brady* violations in the KCDA in 1994 and 1995— right around the same time as Irons' arrest in 1995 and trial in 1996. Post-conviction

discovery revealed that District Attorney Charles Hynes—the same District Attorney in charge of the office when Irons was prosecuted—protected, instead of disciplined, ADAs when their misconduct was discovered.

177.    Hynes first became District Attorney on January 1, 1990. In the *Collins* case, he and others admitted that the only disciplinary procedure in place for *Brady* violations was for Hynes to personally review the appellate decision to decide if discipline was warranted. Hynes and other KCDA executives could not identify a single instance of a prosecutor being disciplined during Hynes's entire 24-year tenure.

178.    At the time of Malik's prosecution, former DA Hynes, as the manager, chief administrator, and policymaker of the KCDA, a City agency, created and/or maintained policies, customs, and practices of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (a) manufacturing false and misleading evidence and testimony;  (b) knowingly presenting false testimony and arguments at criminal proceedings; (c) suppressing *Brady* information; (d) unlawfully arresting, imprisoning, and coercing witnesses; (e) abusing court process; and (f) covering up these unlawful practices.

179.    These policies, customs, and practices have led the Second Circuit and numerous courts within this District to recognize analogous § 1983 *Monell* claims brought by other wrongfully convicted persons. *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d

424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (denying City's motion to dismiss *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights).

180.    These policies, customs, and practices persisted from former DA Hynes's induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

181.    Former DA Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the KCDA.

182.    These policies, customs, and practices proximately caused the violations of Malik's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

183.    Former DA Hynes's policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information. Former DA Hynes's deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Irons' case.

184.    Under former DA Hynes's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to refrain from making any record of

*Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, even though disclosure of such information was and is constitutionally required regardless of whether the information were recorded in written form.

185.    Former DA Hynes's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

186.    Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by other members of the KCDA.

187.    Prosecutors were permitted and encouraged not to comply with the KCDA's ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through Freedom of Information Law requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDA and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

188.    Prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing pressure tactics, promises, and rewards used to influence witnesses.

189.    Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Hynes encouraged such violations by

demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements. To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

190.    Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators. In fact, there was no such process or penalties.

191.    Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved were disciplined.

192.    Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

### D.    <u>The Ample Notice to Former District Attorney Charles Hynes of the Prosecutorial and Investigative Misconduct Occurring in His Office.</u>

193.    Examples of court decisions that put former DA Hynes on notice of the unlawful conduct being committed by his prosecutors and investigators, before such unlawful conduct led to Malik's false conviction, include:

•    *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (upholding *Monell* claim against City of New York for unlawful policies of KCDA that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 19-year imprisonment);

•    *People v. Vilardi*, 150 A.D.2d 819 (2d Dep't 1989) (vacating conviction based on prosecutor's failure to turn over exculpatory police report);

- *People v. Lugo*, 153 A.D.2d 761 (2d Dep't 1989) (granting motion to vacate conviction based on *Brady* and *Rosario* violations because *Rosario* violations clearly undermined conviction, rendering *Brady* analysis unnecessary);
- *People v. Rayford*, 158 A.D.2d 482 (2d Dep't 1990) (reversing conviction and ordering new trial because prosecutor suppressed exculpatory information, and reversing trial court order admitting evidence obtained using suggestive identification procedures);
- *People v. Nedrick*, 166 A.D.2d 725 (2d Dep't 1990) (recounting allegations that prosecutor failed to disclose tape-recorded impeachment material);
- *People v. Anderson*, 160 A.D.2d 806 (2d Dep't 1990) (observing that prosecutor failed to timely disclose impeachment material);
- *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) (reversing conviction because, *inter alia*, prosecutor's improper summation violated defendant's due process rights);
- *People v. Faison*, 176 A.D.2d 752 (2d Dep't 1991) (observing that prosecutor failed to timely disclose witness's prior statement);
- *People v. Crespo*, 188 A.D.2d 483 (2d Dep't 1992) (affirming mistrial grant due to prosecutor's *Brady* violation);
- *People v. Brown*, 187 A.D.2d 437 (2d Dep't 1992) (noting that trial court sanctioned prosecutor for delayed production of *Brady* material);
- *People v. Cecora*, 186 A.D.2d 215 (2d Dep't 1992) (vacating conviction and ordering new trial because prosecution and police failed to disclose interview notes containing potential impeachment information);
- *People v. Hughes*, 181 A.D.2d 912 (2d Dep't 1992) (ordering trial court to hold hearing regarding prosecution's failure to disclose exculpatory police report);
- *People v. Inswood*, 180 A.D.2d 649 (2d Dep't 1992) (acknowledging prosecution's failure to turn over *Brady* material);
- *People v. Lebron*, 184 A.D.2d 784 (2d Dep't 1992) (reversing conviction because prosecution presented false testimony from police officer that was "completely unbelievable and untrustworthy");
- *People v. Jackson*, 198 A.D.2d 301 (2d Dep't 1993) (affirming vacatur of conviction and new trial order because prosecutors failed to timely disclose exculpatory statements, and noting evidence that prosecutor destroyed notes of interview with witness who ultimately provided exculpatory testimony);
- *People v. Gurley*, 197 A.D.2d 534 (2d Dep't 1993) (affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information);
- *People v. Stevens*, 199 A.D.2d 441 (2d Dep't 1993) (noting that prosecution improperly withheld *Brady* and *Rosario* material);
- *People v. Cortez*, 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) (dismissing complaint because intentional destruction of tape containing impeachment material violated court order and constituted *Brady* violation); and
- *People v. Young*, 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992) (ordering new trial because of failure to disclose impeachment material and finding that prosecution witnesses offered "tailored" testimony).

49

E.  **Examples of the Kings County District Attorney's Office's Unlawful Policies, Practices, and Customs**

194.   Examples of former DA Hynes's ongoing policies and practices of encouraging, authorizing, and/or permitting misconduct by his prosecutors and investigators, include:

- *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (reversing denial of habeas petition where prosecutor suppressed *Brady* material and misled defense counsel regarding crucial witness);
- *Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001) (reversing denial of habeas petition where prosecutors suppressed *Brady* material);
- *People v. Scott*, 667 N.E.2d 923 (N.Y. 1996) (observing that prosecution failed to disclose statement regarding polygraph result that had been specifically requested by defendant);
- *People v. Bond*, 735 N.E.2d 1279 (N.Y. 2000) (ordering new trial where prosecution failed to disclose prior unrecorded statements to police by prosecution's main witness that she did not see shooting about which she provided "eyewitness" testimony);
- *People v. Calabria*, 727 N.E.2d 1245 (N.Y. 2000) (ordering new trial where prosecutor repeatedly defied court's ruling and made false or misleading argument to jury);
- *People v. Jenkins*, 774 N.E.2d 716, 720-22 (N.Y. 2002) (Kaye, C.J., dissenting) (observing that prosecutor's delayed midtrial disclosure of ballistics report "blind-sided" defense);
- *People v. Fuentes*, 907 N.E.2d 286 (N.Y. 2010) (observing that prosecutor improperly withheld portion of medical records containing potentially favorable evidence for defense);
- *People v. Khadaidi*, 201 A.D.2d 585 (2d Dep't 1994) (reversing conviction because prosecution failed to disclose interview notes with complainant containing prior inconsistent statement);
- *People v. Alvarado*, 201 A.D.2d 486 (2d Dep't 1994) (affirming order vacating conviction and ordering new trial because prosecution failed to disclose police reports containing impeachment material);
- *People v. Barnes*, 200 A.D.2d 751 (2d Dep't 1994) (observing that prosecutor neither recorded nor disclosed eyewitness's recantation);
- *People v. Bramble*, 207 A.D.2d 407 (2d Dep't 1994) (upholding sanctions for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request);
- *People v. Roberts*, 203 A.D.2d 600 (2d Dep't 1994) (reversing conviction where prosecution delayed by one year in disclosing exculpatory witness statement, by which time witness could not be located prior to trial);

- *People v. Scott*, 216 A.D.2d 592 (2d Dep't 1995) (finding that prosecutor improperly suppressed reports, including polygraph results indicating key witness was withholding information);

- *People v. Rahman*, 231 A.D.2d 745 (2d Dep't 1996) (remitting for hearing concerning prosecution's apparent improper failure to produce eyewitness informant);

- *People v. Perkins*, 227 A.D.2d 572 (2d Dep't 1996) (noting that prosecutor failed to timely disclose, *inter alia*, cooperation agreement with witness);

- *People v. Callendar*, 227 A.D.2d 499 (2d Dep't 1996) (vacating conviction and ordering new trial due to prosecutor's failure to turn over notes of detective's prior statement);

- *People v. Bruce*, 224 A.D.2d 438 (2d Dep't 1996) (ordering new trial because of prosecutor's failure to produce police reports containing impeachment material);

- *People v. LaSalle*, 243 A.D.2d 490 (2d Dep't 1997) (ordering new trial because of prosecutor's "blatant misrepresentation of the facts" during summation);

- *People v. Gourgue*, 239 A.D.2d 357 (2d Dep't 1997) (reversing conviction and ordering new trial because prosecutor recorded complainant's statements in question form to "circumvent" disclosure obligation);

- *People v. Hill*, 244 A.D.2d 572 (2d Dep't 1997) (affirming order sanctioning prosecutor for *Rosario* violation);

- *People v. Gramby*, 251 A.D.2d 346 (2d Dep't 1998) (observing that prosecutor suppressed and failed to timely disclose 911 tape);

- *People v. Campbell*, 269 A.D.2d 460 (2d Dep't 2000) (reversing conviction and dismissing charge where prosecutor improperly suppressed tape-recorded statement by complainant);

- *People v. Maddery*, 282 A.D.2d 761 (2d Dep't 2001) (noting prosecutor's delayed disclosure of 911 tape);

- *People v. King*, 298 A.D.2d 530 (2d Dep't 2002) (noting prosecutor's delayed disclosure of 911 tape);

- *People v. Vielman*, 31 A.D.3d 674 (2d Dep't 2006) (reversing conviction and ordering new trial because prosecutor's summation "rested on a false premise" and was "a blatant attempt to mislead the jury");

- *People v. Jones*, 31 A.D.3d 666 (2d Dep't 2006) (ordering new trial where prosecution failed to correct false testimony of key witness and improperly vouched for witness's credibility);

- *People v. Thompson*, 54 A.D. 3d 975 (2d Dep't 2008) (observing that prosecutor suppressed *Brady* material indicating someone other than defendant committed crime);

- *People v. Ramos*, 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) (vacating conviction and ordering new trial because, due to KCDA policy of not taking notes of witness interviews, trial prosecutor was unaware of information acquired by previously assigned prosecutors for which court had ordered disclosure);

- *People v. Davis*, 184 Misc. 2d 680 (Sup. Ct. Kings Cty. 2000) (dismissing indictment because prosecution violated court's order to disclose exculpatory evidence to defense before indictment);
- *People v. Cannon*, 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) (upholding sanctions against prosecution for failure to preserve surveillance photographs); and
- *People v. Malik*, 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) (vacating conviction and ordering new trial where prosecution improperly suppressed police report).

195.   Under former DA Hynes's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

196.   Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible. No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

197.   To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it. Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions—sometimes within weeks or even days of court decisions identifying the misconduct.

198.   High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution. In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

199.    Former DA Hynes's office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

200.    Former DA Hynes's office provided no training on how to question or evaluate informant or accomplice witnesses.

201.    One high-ranking official testified that, despite having virtually daily contact with former DA Hynes over many years, he never heard former DA Hynes discuss the training of prosecutors in such areas.

202.    Even after judgments were entered against KCDA-affiliated individual capacity defendants in various civil rights lawsuits alleging prosecutorial and investigative misconduct, former DA Hynes's office conducted no investigation and imposed no discipline on any of the employees involved.

## DAMAGES

203.    This action seeks damages for the period from December 15, 1995, through the present. Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds, and omissions caused Malik to be maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure 27 years of wrongful imprisonment, including the physical and substantial mental damage arising therefrom.

204.     Malik was 18 years old at the time of his incarceration and was released in 2022 at age 45.

205.    He spent his entire young adulthood imprisoned for a crime he did not commit, serving his sentence in various maximum-security prisons throughout New York State.

206.   During his wrongful imprisonment, Malik suffered extreme hardships, including, without limitation, physical assault, psychological abuse, extreme degradation, pain and suffering, and the loss of more than 27 years of his life. The notoriety of the case and its horrific nature made Malik a target of abuse and attack; he was forced to carry a razor blade in his rectum to protect himself. In the words of a forensic psychologist who evaluated him, he is "psychologically crippled." He suffers from severe agoraphobia and can barely manage to leave his home. He has grave difficulty performing simple life tasks. For example, putting on a seat-belt triggers Malik's PTSD about being shackled.

207.   Malik also lost tremendous opportunities. He lost the most vital years of his life and precious time with his family and friends.

208.   As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Malik, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational

54

opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

209. All the alleged acts, misdeeds and omissions committed by Individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of Individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983
*Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, and Suppression of* Brady *Information
(U.S. Constitution Amendments IV, V, VI, and XIV)*

### Against Individual Defendants

210. Malik repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

211. Individual Defendants, acting knowingly, intentionally, deliberately, with malice, and under color of law, deprived Malik of his clearly established rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable seizure, and under the Sixth and Fourteenth Amendments to the U.S. Constitution to present a complete defense. They did so by, *inter alia*: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony by coercing Malik into giving a false confession and assisting in the production

of false testimony against him by two witnesses whom they knew were unreliable; (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information; (3) creating a line-up that was so biased that it signalled to a witness (who previously identified someone else) who she should select as the perpetrator.

212.    No person of reasonable caution and acting in good faith, having the knowledge and information Individual Defendants had, would have been warranted in concluding that Malik was involved in the murder of Kaufman, such as to support a probable cause determination. Even setting aside their knowledge that they had manufactured evidence and testimony, Individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about the truth of the "confession" and the statements of Robinson and Shabazz, as set forth infra.

213.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Malik's indictment was secured based on bad-faith police misconduct. Specifically, the false confession extracted by Defendants Scarcella and Chmil was, upon information and belief, the central piece of evidence presented to the grand jury and proximately caused the resulting indictment.

214.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Malik of a fair trial and result in his wrongful conviction and incarceration.

215.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information would be concealed from Malik and his attorney.

216.     Individual Defendants' conduct, committed in concert with one another or others, deprived Malik of his rights under the Constitution: (1) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence in violation of his rights under the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; (2) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution; and (3) to present a complete defense in violation of the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment to the U.S. Constitution

217.     Individual Defendants' acts and omissions proximately caused the continuation of Malik's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

218.     Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Malik's constitutional rights.

219.     Defendants Scarcella and Chmil's falsification of evidence, coercion of Malik, and his arrest without probable cause establishes that they acted with actual malice.

220.     Defendants John and Jane Does 1-25 are employees of the NYPD or KCDA who knew of and aided and abetted, and/or failed to intervene to prevent, Defendants Scarcella, Chmil, and Paul's falsification of evidence, coercion of Malik, arrest of Malik without probable cause, and denial of Malik's right to a fair trial.

221.    The prosecution terminated in Malik's favor when his conviction was eventually vacated and the indictment against him dismissed.

222.    Malik was, in fact, innocent of the crime for which he was convicted and incarcerated.

223.    Individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983**
*Malicious Prosecution and Denial of Fourth Amendment Rights*
*(U.S. Constitution Amendments IV and XIV)*
**Against Individual Defendants**

224.    Malik repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

225.    Individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Irons and prosecute him for the murder of Kaufman, caused Irons to be arrested, charged, and prosecuted for that crime, thereby violating Irons' clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures.

226.    Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Malik, including but not limited to the fact that his false confession was the product of improper coercion by Defendants Scarcella and Chmil, and this factor, as well as additional material exculpatory and impeachment evidence that

Individual Defendants did not disclose, undermined the evidence presented in support of a probable cause finding against Irons.

227. In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Malik, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing Malik into giving a false confession; (2) manipulation of witness testimony, and (3) suppressed *Brady* information, including about alternative suspects.

228. Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Malik's constitutional rights.

229. Individual Defendants initiated and continued the prosecution against Malik without probable cause, in violation of his clearly established constitutional rights. No reasonable officer at the time of Malik's prosecution or thereafter would have believed this conduct was lawful.

230. The prosecution terminated in Malik's favor when his conviction was eventually vacated and the indictment against him dismissed.

231. Malik was, in fact, innocent of the crime for which he was convicted and incarcerated.

232. As a direct and proximate result of Individual Defendants' conduct, Malik was maliciously prosecuted, wrongly convicted, imprisoned for nearly 27 years, and suffered the other grievous damages and injuries set forth above.

**THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983**
*Monell v. Department of Social Services*, 436 U.S. 658 (1978)
**Against Defendant the City of New York**

233.   Malik repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

234.   At the time of Malik's arrest and prosecution, the NYPD and KCDA, both agencies of Defendant the City of New York, created and maintained policies, customs, and practices of deliberate indifference to violations by its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony; (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information; (3) precluding, causing the preclusion of, or failing to intervene in the preclusion of alibi evidence; and (4) covering up these unlawful practices.

235.   Just a year and a half before Malik's trial, the Mollen Commission investigated corruption in the NYPD and exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

236.   This Court has previously found that the Mollen Report provides sufficient evidence to establish that there was an unlawful custom or practice within the NYPD during the period in question. *See e.g.*, *Pipitone*, 57 F. Supp. at 191. Indeed, the investigation of

Kaufman's murder, and the resulting conviction of Irons, falls within a judicially recognized window wherein Defendant Scarcella "engaged in false and misleading practices." *Hargrove*, 2015 N.Y. Misc. LEXIS 3691, at *24.

237.    As the Mollen Report found, Defendants Scarcella, Chmil, and Paul's misconduct could not have been isolated or unknown within the NYPD. Rather, a laissez-faire NYPD culture, paired with a statistic obsessed KCDA, allowed Defendants Scarcella, Chmil, and Paul to continuously violate the constitutional rights of the citizens of New York City. In Malik's case, Defendants Scarcella and Chmil manufactured confessions to implicate Malik, manufactured Malik's confession, then manipulated a patently unreliable witness into repudiating her prior identifications in order to inculpate Malik and secure his unlawful arrest, conviction, and imprisonment.

238.    The size and magnitude of Defendants Scarcella and Chmil's misconduct could not have gone unnoticed. Yet Defendants suffered no consequences.

239.    The prosecutors' conduct in this case also exemplifies the KCDA's culture during this period that valued winning over the truth or defendants' constitutional rights. Former DA Hynes has admitted in litigation that he and high-level KCDA management failed to discipline prosecutors who were found by appeals courts to have acted improperly by withholding *Brady* material and engaging in other misconduct. This created a *de facto* policy of immunity from disciplinary action that fostered prosecutorial misconduct so long as it secured convictions. Such prosecutorial misconduct included, *inter alia*, suppressing *Brady* information, as in the instant case.

240.   The ADAs prosecuting Malik knew that DA Hynes would not only fail to discipline them, but that he would support them and oppose any attempts to uncover the wrongdoing of wrongful convictions.

241.   The violations of Malik's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the NYPD, the KCDA, former DA Hynes, and by extension, the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Malik, subject to arrest and investigation, including:

- the institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:
- the duty not to create or use false or misleading evidence, testimony, and arguments during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings; s
- the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and
- the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and
- the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

242.   The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such

policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

243.   The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions, that its employees: (1) wrongfully withheld, lost, or destroyed evidence favorable to the defense that was required to be timely disclosed to the defense under *Brady*; (2) had presented or failed to correct false or misleading testimony and argument; and (3) had abused judicial process to coerce false or inherently unreliable testimonies and statements.

244.   Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated, or failed to take preventative or remedial measures to terminate said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining employees who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

245.   The aforesaid policies, practices, and customs of the City were substantial contributing factors in bringing about the aforesaid violations of Malik's rights under the

Constitution and laws of the United States and in causing his wrongful conviction and resulting damages.

246.    The supervisory and policymaking officers and officials of the City were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt. The violations of defendants' rights were endemic, and the City was aware of these practices but did not take corrective or preventative action to correct it.

<u>**FOURTH CAUSE OF ACTION**</u>

**Malicious Prosecution**
*New York State Law*
**Against All Defendants**

247.    Malik repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

248.    Individual Defendants, acting individually and in concert, with malice, and knowing that probable cause did not exist to arrest Malik and prosecute him for the murder of Kaufman, caused Irons to be arrested, charged, and prosecuted for that crime.

249.    Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Malik, including but not limited to the fact that Irons and Ellerbe had been coerced into giving false confessions implicating Malik, Malik's own false confession was the product of improper coercion by Defendants Scarcella and Chmil, the Robinson identification of Malik was manipulated and false, another individual had confessed to the murder, and additional material exculpatory and impeachment evidence

that Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Malik.

250.    In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Irons, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing all into giving a false confession; and (2) suppressed *Brady* information, including about alternative suspects.

251.    Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Malik's constitutional rights.

252.    Individual Defendants initiated and continued the prosecution against Malik without probable cause.

253.    The prosecution terminated in Malik's favor when his conviction was eventually vacated and the indictment against him dismissed.

254.    Malik was, in fact, innocent of the crime for which he was convicted and incarcerated.

255.    Defendant the City of New York is liable under the doctrine of *respondeat superior* for the malicious prosecution of Irons by Individual Defendants, all of whom were acting as agents of the City of New York and within the scope of their employment.

256.   As a direct and proximate result of Defendants' conduct, Malik was maliciously prosecuted, wrongly convicted, imprisoned for nearly 27 years, and suffered the other grievous damages and injuries set forth above.

### FIFTH CAUSE OF ACTION

**New York State Constitution**
*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence,*
*Suppression of Exculpatory Information, and Malicious Prosecution*
*(New York State Constitution, Article I, §§ 5, 6, and 12)*
**Against All Defendants**

257.   Malik repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

258.   The acts and omissions described above caused violations of Malik's rights under the New York State Constitution, including the rights to due process and to be free from unreasonable searches and seizures.

259.   To the extent that any of Malik's claims against one or more Defendants is unavailable under 42 U.S.C. § 1983—including, but not limited to, 42 U.S.C. § 1983's lack of *respondeat superior* liability—Malik retains a legal remedy for such claims under the New York State Constitution.

### SIXTH CAUSE OF ACTION

**Negligence**
*New York State Law*
**Against Defendant the City of New York**

260.   Malik repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

261.   Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to Irons.

262.   Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its agents and employees with regard to the matters described above. The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Malik's wrongful conviction and resulting damages.

263.   The City's negligence and gross negligence directly and proximately caused Irons to be wrongly prosecuted and imprisoned for nearly 27 years.

264.   Malik was, in fact, innocent of the crime for which he was convicted and incarcerated. Malik's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the indictment against him dismissed. Furthermore, this cause of action is tolled as the City concealed from Malik—and is still concealing to this day—the conduct giving rise to this cause of action.

265.   As a direct and proximate result of Defendants' conduct, Malik was maliciously prosecuted, wrongly convicted, imprisoned for nearly 27 years, and suffered the other grievous damages and injuries set forth above.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Thomas Malik demands judgment against the above-captioned Defendants as follows:

> a.  for compensatory damages to be determined at trial, but in all events no less than $50 million;

b.  for punitive damages against Individual Defendants in an amount to be determined at trial;

c.  for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.  for pre- and post-judgment interest as allowed by law; and

e.  for such other relief as this Court deems just and proper.

Dated: November 8, 2023
        New York, New York

RONALD L. KUBY
RHIDAYA TRIVEDI
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, NY 10011
212-529-0223
ronaldlkuby@gmail.com


*Attorneys for Plaintiff*

68